

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-12-00016-CV
_____

IN THE MATTER OF THE MARRIAGE OF
BETTY JANIS EDWARDS AND
MARVIN LAVERL EDWARDS

On Appeal from the County Court at Law
Hopkins County, Texas
Trial Court No. 39,810

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Moseley

MEMORANDUM OPINION

In the divorce between Marvin Laverl Edwards and Betty Janis Edwards, a division of property was made by the trial court in Hopkins County wherein Betty was awarded recovery for enhancement of the value of Laverl's separate property real estate and for the value of the purchase of cattle. She was also awarded attorney's fees should there be an appeal. Laverl, objecting to each of these, has filed his appeal to this Court. We affirm the judgment of the trial court.

I.      **Background**

Betty and Laverl were married in 1998 and separated in 2010. The couple had no children, and at a final hearing to the court, the appropriate division of property was the sole, although by no means straightforward, issue.

At the time of their marriage, Laverl already owned a 130-acre tract that was improved with a small (16 foot by 32 foot) cabin and a dairy barn. The Edwards planned to build a home on this tract. The cabin was not only small, it was not in good shape and lacked amenities. The couple moved the cabin to a location close to the future home site, made improvements, and lived in the cabin while their home was under construction. Construction of the new home commenced in the spring of 2002 and was completed (primarily through the efforts of the Edwards themselves) approximately three and one-half years later. The couple lived in their new home[1] until the time of their separation in 2010. No money was borrowed for materials or

---

[1]Laverl testified that he framed the house, roofed it, trimmed and wired it, and installed the plumbing. Betty testified that she sanded and polished the wood used in the home's interior. The couple jointly installed the laminate flooring, and had tile and carpet installed.

supplies used to build the home. Betty testified that she contributed approximately $35,000.00 of her separate retirement funds for materials and supplies and that the total construction cost was between $75,000.00 and $100,000.00. Laverl contradicted these figures, testifying that he contributed 100 percent of the funds utilized in building the home, and that the total construction cost was approximately $57,000.00.

In addition to building the home and updating the pre-existing cabin, the couple constructed a 30 foot by 60 foot metal shop and a pump house on Laverl's acreage. Finally, they "revamped" the pre-existing dairy barn for Russell (Laverl's son) to use as living quarters.

James Driggers, Betty's appraisal expert, testified that the value of Laverl's 130 acres prior to improvements was $325,000.00. All improvements increased the property value by $178,000.00, yielding a total improved value of $502,660.00.

Prior to the marriage, Laverl owned fifty head of cattle located on the 130-acre farm where the home was later constructed.[2] Betty claims she contributed approximately $50,000.00 in separate funds toward the purchase of new cattle during the course of the marriage. Most of these cattle, she claims, have since been sold. Laverl contends that all of the cattle, with the exception of thirty-seven head, were sold in 2004. He contends that Betty did not contribute to the purchase of any of the cattle that were sold. The couple purchased additional cattle in 2006 and 2007. Laverl concedes Betty contributed $11,000.00 of her separate funds toward the purchase of the new cattle, but the remainder of the funds for those purchases was community property.

---

[2]Laverl testified he owned additional cattle on a different piece of property.

The trial court granted the divorce, divided the marital estate and confirmed the parties' separate estates. The court found the community enhancement to Laverl's separate property was $177,960.00, and awarded Betty and Laverl each one half of that value—$88,980.00. The court further awarded Betty $24,038.00 for her one-half interest in the parties' cattle, and $20,000.00 for her interest in personalty awarded to Laverl. The court imposed an equitable lien[3] in Betty's favor against the entirety of Laverl's 130-acre tract to secure the payment to Betty of $133,018.00.[4] In its findings of fact, the trial court determined that

> [t]he time, toil and effort of Petitioner and her separate funds expended for the benefit of the separate property of Respondent as to home and other improvements on the 130 plus acres which is the separate property of Respondent, and the enhanced value to his separate property during the marriage as to Petitioner's 1/2 of enhancement to the Respondent's separate property is $88,980.00. The reimbursement for amounts expended from her separate property toward the purchase of cattle taking into account the promissory note owed to Alliance Bank on the cattle of $55,000.00 as to Petitioner's 1/2 is $24,038.00 and $20,000.00 for interest in personalty which the Court awarded to husband as set out in Exhibit "B" as to the values contained therein.

---

[3]Although the trial court makes reference to this as an owelty lien, such an equitable lien is a slightly different creature. "Owelty" is "[e]quality as achieved by a compensatory sum of money given after an exchange of parcels of land having different values or after an unequal partition of real property" or the sum of money so paid to achieve that end. BLACK'S LAW DICTIONARY 1214 (9th ed. 2009).

[4]This amount includes $88,980.00 for reimbursement against Laverl's separate property, $24,038.00 as Betty's one-half interest in the parties' cattle, and $20,000.00 as Betty's interest in personalty awarded to Laverl. Laverl was ordered to pay the total amount to Betty within 180 days from December 1, 2011, and he was ordered to sign a promissory note to Betty, together with a deed of trust, to secure payment of the debt. Laverl signed the note and deed of trust as ordered; payment of the note has been superseded pursuant to an order entered by the trial court. Laverl makes no objection to the imposition of a lien upon his separate property homestead for things other than improvements to that property (e.g., the value of cattle).

## II.    Analysis

### A.    Reimbursement—Enhancement of Separate Property

Laverl contends the trial court erred in the award of $88,980.00 to Betty based on her reimbursement claim.  He claims that Betty failed to establish what portion of the enhanced value was attributable to her separate funds and that she failed to demonstrate that any funds so contributed were her separate property.[5]  Laverl also challenges this award because expert testimony establishing the enhanced value of Laverl's separate property did not take into account that two structures (the cabin and the dairy barn) were situated on Laverl's separate property prior to the marriage and their pre-marriage value was not considered.  Finally, Laverl disputes the accuracy of the enhanced value to the extent it is based on the value of Betty's time, toil, and effort expended in improving his separate property.

---

[5]Laverl relies on *Rogers v. Rogers*, 754 S.W.2d 236 (Tex. App.—Houston [1st Dist.] 1988, no writ), for the proposition that a party claiming reimbursement to an estate must show what portion of the enhanced value was attributable to these expenditures.  *Rogers* involved a claim for reimbursement of the enhanced value of the wife's separate estate, resulting from the expenditure of community and/or separate funds used to complete construction of the wife's separate property.  The court determined that there was no evidence to establish the value of the property at the time of the marriage, so as to determine the enhanced value.  Because there was no evidence of the market value of the house prior to improvement paid for by community or separate funds, the reimbursement claim failed. *Id.* at 239.  In dicta, the court indicated that even if evidence of enhanced value had been shown, there was no evidence of what portion of the enhanced value was attributable to these expenditures, citing *Jensen v. Jensen*, 665 S.W.2d 107, 109 (Tex. 1984) (explaining why cost, rather than enhanced value, was better measure of reimbursement for community time and labor).  *Jensen* adopted the reimbursement theory with regard to the manner in which to treat increases in the value of corporate stock during the marriage where that stock is the separate property of one spouse. *Id.*  In this context, a party seeking reimbursement must establish the value of the time and effort expended to enhance separate property that exceeds the time and effort reasonably necessary to manage and preserve the separate estate, and the remuneration received as compensation for that time and effort. *Lifshutz v. Lifshutz*, 199 S.W.3d 9, 28 (Tex. App.—San Antonio 2006, pet. denied).  As recognized in *Rogers*, the proper measure of reimbursement is enhancement in value, not cost. *Rogers*, 754 S.W.2d at 240.  In order to prove a claim of reimbursement based on enhancement value, there must be evidence of the fair market value of the property prior to improvements and the fair market value subsequent to improvements. *See Garza v. Garza*, 217 S.W.3d 538, 547 (Tex. App.—San Antonio 2006, no pet.).

At the outset, we address a discrepancy in the parties' characterization of the trial court's decision. According to Laverl, the trial court determined that Betty used her separate funds to enhance the value of Laverl's separate estate. From this premise, Laverl maintains that Betty failed to prove that her separate funds contributed to the improvements, and her separate estate was, therefore, erroneously reimbursed.

Betty maintains, however, that the trial court found the community estate enhanced the value of Laverl's separate estate. The trial court specifically found, based on clear and convincing evidence, that Laverl owned the "130 acres (with home)," valued at "$502,960.00 subject to community reimbursement of $177,960.00 for a net value of $325,000.00." The trial court further found that Betty expended separate funds for the benefit of Laverl's separate property as to the home and other improvements on the 130 acres; no specific amount is mentioned. The trial court concluded that Betty's separate estate is entitled to $88,980.00 in reimbursement. This conclusion utilizes language typically used in the devising portion of the decree that property is being awarded as a spouse's sole and separate property.[6] The decree indicates that $177,960.00 is for community enhancement to Laverl's separate estate.

While there appears to be some degree of internal conflict within the findings of fact and conclusions of law and between the findings and conclusions and the final decree on the issue of whether Betty's separate estate was entitled to reimbursement based in part on her expenditure of separate funds to enhance Laverl's separate property, we do not believe these apparent

---

[6]The decree states that "the community enhancement to Respondent's separate property is $177,960.00 and Petitioner is awarded 1/2 for a value of $88,980.00 as Petitioner's sole and separate property and Respondent is awarded 1/2 for a value of $88,980.00 as Respondent's sole and separate property."

6

discrepancies are outcome determinative.[7] We need not decide whether the trial court abused its discretion in issuing the reimbursement award based on the narrow issue of whether Betty properly traced her separate funds to the improvement of Laverl's separate estate.[8] It is apparent that some of the funding for improvements to Laverl's separate estate was provided by Betty. It is further apparent that funding for these improvements was also provided by the community estate.[9] The evidence is unclear regarding the specific monetary contributions provided by each estate. We, therefore, determine whether sufficient evidence supports the reimbursement award to the community estate.

### (1) Community Appropriately Reimbursed for Enhanced Value of Separate Estate

The Texas Family Code requires the trial court to divide a marital estate in a "just and right" manner, considering the rights of the parties. TEX. FAM. CODE ANN. § 7.001 (West 2006).

---

[7]Laverl cites *City of Laredo v. R. Vela Exxon, Inc*., 966 S.W.2d 673, 678 (Tex. App.—San Antonio 1998, pet. denied), for the proposition that where, as here, there is a conflict between findings of fact and conclusions of law and the judgment, the findings of fact and conclusions of law are controlling. Laverl contends that because the findings of fact and conclusions of law indicate that separate funds were utilized to enhance Laverl's separate estate, Betty was required to establish that any funds she contributed toward such enhancement were her separate property. Property possessed by either spouse during or on dissolution of marriage is presumed to be community property. TEX. FAM. CODE ANN. § 3.003(a) (West 2006). To rebut this presumption, the person seeking to prove the separate character of the property must do so by clear and convincing evidence. TEX. FAM. CODE ANN. § 3.003(b) (West 2006). Betty testified that $35,000.00 in separate funds was expended in improvements to Laverl's separate property. We acknowledge Betty introduced summaries of expenditures at trial without objection from Laverl.

Error, if any, in the trial court's finding that Betty's separate estate was entitled to reimbursement in the amount of $88,980.00, is harmless. Reimbursement to the community estate (as indicated in the final decree) would not have resulted in a different division. *See Cook v. Cook*, 679 S.W.2d 581, 585 (Tex. App.—San Antonio 1984, no writ) (error must render trial court's division manifestly unjust).

[8]Counsel for Laverl recognized the nature of Betty's claim at trial, stating, "As opposed to asking for reimbursement of the separate money that she put in, she's requesting, which is permissible under Texas law -- she is requesting to be reimbursed the amount of the increase in value to your 130-acre farm. Do you understand that?"

[9]Laverl testified that he utilized separate funds for improvement of his separate estate during the marriage. On appeal, he does not attack the validity of the enhancement award on this basis.

7

The trial court may generally exercise broad discretion in dividing a marital estate. The party complaining of the trial court's division of property must demonstrate from evidence in the record that the division was so unjust that the trial court abused its discretion. *Bigelow v. Stephens*, 286 S.W.3d 619, 620 (Tex. App.—Beaumont 2009, no pet.). Thus, we reverse the trial court's judgment only where it "clearly abused its discretion and if the error materially affects the court's just and right division of the property." *Id.* (quoting *Nelson v. Nelson*, 193 S.W.3d 624, 628 (Tex. App.—Eastland 2006, no pet.)). If there is any reasonable basis for doing so, we must presume that the trial court exercised its discretion properly. *Pletcher v. Goetz*, 9 S.W.3d 442, 446 (Tex. App.—Fort Worth 1999, pet. denied).

When one marital estate improves another without receiving a benefit, a claim for reimbursement may arise. *See* TEX. FAM. CODE ANN. § 3.402 (West Supp. 2012). The proper measure of reimbursement is the value of the enhancement to the benefitted estate. TEX. FAM. CODE. ANN. § 3.402(d). A trial court applies equitable principles in deciding whether to recognize a claim for reimbursement. *Vallone v. Vallone*, 644 S.W.2d 455, 458 (Tex. 1982); TEX. FAM. CODE ANN. § 3.402(d). "Great latitude must be accorded to the trial court in applying equitable principles to determine reimbursement claims because this does not involve simply balancing the ledgers between competing marital estates." *Nelson*, 193 S.W.3d at 632.

When improvements are made during the marriage, there is a presumption that the funds expended on such improvements came from community property funds. TEX. FAM. CODE ANN. § 3.003(b). If this presumption is not rebutted, all expenditures are presumed to be community expenditures.

8

The evidence here plainly demonstrates enhancement of Laverl's separate estate by the community estate. The parties' house was constructed of hickory, oak, and cypress. The hickory and oak lumber was cut from trees on Laverl's farm. Timber grown on separate property is community property. *McElwee v. McElwee*, 911 S.W.2d 182, 189 (Tex. App.—Houston [1st Dist.] 1995, writ denied). Portions of the house were constructed from cypress purchased in Arkansas after the parties were married. Because there is no specific evidence regarding the source of these funds, the funds are presumed to be community funds. *See* TEX. FAM. CODE ANN. § 3.003(b). The carpet, laminate, and tile used in the house were purchased during the marriage and are thus presumed to have been purchased with community funds.[10] *See id.*

Betty testified that she paid, from her separate funds generated from the sale of an annuity from her parents, for the installation of a gravel road from the house to the interstate. In addition, Betty purchased some faucets for the house. Betty purchased "materials" for the house[11] and believes Laverl also contributed to the purchase of these materials.[12] Betty testified

---

[10]Neither party testified regarding the source of the funds for these specific purchases. In order to overcome the community property presumption, the burden is on the spouse claiming certain property as separate to trace and clearly identify the property claimed to be separate. *Granger v. Granger*, 236 S.W.3d 852, 856 (Tex. App.—Tyler 2007, pet. denied).

[11]Such materials ostensibly include screws, doors, lumber, steel, paint, carpet, plywood, and sanding belts.

[12]At the time of the marriage, Betty was working at the post office in Arkansas. She retired in 2001 and drew $1,457.00 in United States Postal Service retirement. When her first husband died, Betty inherited a rice farm consisting of 150 acres, which she deeded to her children while retaining a life estate. As a result, Betty receives a $10,000.00 yearly payment from the profits earned by the rice farm. Betty also receives monthly payments on the sale of real property she owned prior to the marriage. In addition, Betty received a $40,000.00 annuity from her parents, and testified that from this sum, $21,000.00 was spent on the road and on materials to build the home. Betty also repeatedly transferred funds to Laverl's account. Betty testified that her "income" was in the Newport bank account until 2006.

that she also paid large credit card bills from her funds—credit cards that were used to purchase tools needed to build the house. She further testified that the house was built using funds that she had and that "he had."

Laverl testified that a total of $57,000.00 was needed to construct the house. These funds, he claims, were derived from the sale of a house he owned before the marriage. Laverl claims that he reimbursed Betty for whatever money she expended in the construction of the house. Laverl testified that Betty expended $18,000.00 on the rock driveway, but stated this was paid from community funds. Laverl did some work for one of the few subcontractors used on building the house, and in exchange, the subcontractor installed the tile. In addition, a second subcontractor installed the cabinets.

Laverl, Russell, and Betty framed the house. Laverl trimmed and roofed the house. In addition, Laverl wired the house and installed the plumbing. Betty finished the wood utilized in the interior of the home. She and Laverl installed the laminate. A subcontractor was hired to install the carpet. Laverl testified that he purchased the tools and equipment needed to construct the house.

Laverl testified that approximately $9,000.00 was expended in fixing up the pre-existing cabin the parties lived in while building their home. The cabin was small, measuring 16 feet by 32 feet, and had no plumbing or electricity. Betty and Laverl installed water lines, septic, and electricity in the cabin. Other improvements included paneling and the installation of a new door. Tin was installed on the outside of the cabin, a new roof was added, and a porch was built.

Betty and Laverl did this work themselves. Neither party provided specific testimony regarding the source of the funds utilized to refurbish the cabin. It is thus presumed to be community.

A dairy barn was located on the 130 acres when Laverl purchased the property. Laverl testified, "They appraised that dairy barn at $40,000 when I bought it. It's my opinion you couldn't get nothing for it." The parties expended approximately $750.00 on the barn to install stick-on tile on the floor and to install a shower. According to Laverl, community funds were used for these small projects.

The parties also constructed a 30 foot by 60 foot metal shop, constructed of steel with a concrete floor. Laverl testified that the parties purchased steel costing $2,288.00 and concrete costing $1,965.00. Laverl testified that the remaining materials used to construct the metal shop were owned by him prior to the marriage. Finally, the parties constructed a small pump house.

Driggers valued the parties' home at $109,760.00. He placed a value on the metal shop of $27,000.00. The pump house was valued at $1,200.00. In its refurbished condition, the cabin was valued at $25,000.00. The dairy barn was valued at $15,000.00. Absent any of these improvements, the 130 acres was valued at $325,000.00. With these improvements, the property was valued at $502,960.00, yielding an enhanced value of $177,960.00.[13]

As a general rule, testimony that property was purchased with separate funds, absent tracing of such funds, is insufficient to rebut the presumption that community property was the source of those funds. *Garza v. Garza*, 217 S.W.3d 538, 548 (Tex. App.—San Antonio 2006, no pet.). Any doubt as to the character of property should be resolved in favor of the community

---

[13]This is the only testimony regarding enhanced value. There is no testimony regarding the increase in value, if any, of the land itself, during the twelve years Laverl and Betty were married.

11

estate. *Id*. It is likewise presumed that funds used to improve separate property during the marriage are community expenditures. TEX. FAM. CODE ANN. § 3.003(b); *McCann v. McCann*, 22 S.W.3d 21, 23 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). Because this presumption was not rebutted by either party, the funds used to enhance the value of Laverl's separate estate are presumed to be community funds. Thus, reimbursement of the enhanced value of Laverl's separate estate to the community estate is appropriate.

### (2) Evidence of Separate Estate's Enhanced Value Was Sufficient

Laverl complains, though, of the manner in which the enhanced value of his separate estate was calculated. The cabin and dairy barn were located on the property prior to the marriage and were improved after the marriage. Laverl is critical of Driggers' testimony and report in this regard because the value assigned to each of these structures was premised on the assumption that they were newly built, rather than merely improved. Consequently, Laverl contends the trial court erred in accepting Driggers' valuation of the farm, and the resulting reimbursement award.

Betty, as the party claiming reimbursement, has the burden of proving the enhancement value to Laverl's separate estate. *See Kimsey v. Kimsey*, 965 S.W.2d 690, 700 (Tex. App.— El Paso 1998, pet. denied). The enhanced value of separate property is the difference between the fair market value before and after any improvements made by the community during the marriage. *Garza*, 217 S.W.3d at 546.

In his appraisal report and testimony, Driggers assigned a value to each structure located on Laverl's separate property. Because the house, pump house, and metal shop were entirely

12

new structures, their values are not contested. But because the dairy barn and cabin were improved, pre-existing structures, Laverl claims proof of enhancement value is insufficient because it fails to take into consideration the value of these structures prior to improvements.

Conversely, Betty maintains that proof of the total enhanced value of Laverl's separate property is sufficient, based on evidence of the fair market value of the separate estate prior to improvements and the fair market value of the separate estate after improvements. Betty contends there is no requirement that the evidence must be broken down into pre-improvement and post-improvement market values for each individual structure. Rather, it is sufficient to provide proof of the total enhancement value of the separate property.

Here, the evidence at trial established the fair market value of Laverl's separate estate prior to improvements as $325,000.00. This value includes the land itself, the pipe fencing, the driveway, the improved pasture and lake, with interstate frontage. After having described the improvements to Laverl's separate estate made during the marriage, including improvements made to the cabin and dairy barn, Driggers testified that the fair market value of the property was $502,960.00. It was Driggers' opinion that "these improvements" enhanced the value of the property by $178,000.00. This is evidence of the enhanced value of the property as a whole as a result of the entirety of the improvements.[14] The values attributed to individual pieces of

---

[14]It is apparent that Driggers placed little to no value on the cabin and dairy barn in their unimproved condition. With respect to the cabin, Driggers testified that "[i]n its present condition and its situation being behind the home, I give it a value of 25,000. . . . I didn't give it a high value. . . . It does have its own electric, sewer, and septic, my understanding. But I gave it an estimated value of 25,000 because of the situation." It is apparent the value placed on the cabin was attributed to the fact that it was located behind the home, and had electricity, sewer, and septic. These were all improvements made by the community. Before these improvements were made, the cabin was an old fishing cabin, located by the lake, without plumbing or electricity. The attic and walls were not insulated, and it needed a new roof and new walls inside. All of these improvements were made by the community, in addition to the

property "are evidentiary to the ultimate issue of whether the trial court divided the properties in a just and right manner." *Zeptner v. Zeptner*, 111 S.W.3d 727, 740 (Tex. App.—Fort Worth 2003, no writ) (citing *Finch v. Finch*, 825 S.W.2d 218, 221 (Tex. App.—Houston [1st Dist.] 1992, no writ) (value of specific property is not ultimate issue and need not be set out in findings of fact)).

Betty also offered into evidence a sworn inventory and appraisement which specified that Laverl's 130 acres, including improvements to the cabin and dairy barn, plus the construction of the marital residence and the metal shop, was $502,960.00, subject to community reimbursement of $177,960.00. The property's unenhanced value is stated as $325,000.00. Similar evidence was found sufficient to support a reimbursement award in *Hailey v. Hailey*, 176 S.W.3d 374, 385 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (wife's inventory and appraisement admitted into evidence established community expenditures of $1,500.00 on improvements to separate estate). *See also Aduli v. Aduli*, 368 S.W.3d 805, 820 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (inventory and appraisement admitted into evidence accepted as shorthand rendition of testimony). The testimony of a spouse as to the pre- and post-improvement value of property is sufficient to sustain a finding as to the amount of the enhancement value. *Smith v. Smith*, 715 S.W.2d 154, 157 (Tex. App.—Texarkana 1986, no writ).

---

installation of water lines, electricity, and septic. Porches were built around the cabin and a portion of the porch was enclosed for a washroom. The cabin was quite small, measuring 16 feet by 32 feet.

At the time of the marriage, the dairy barn was not being used for any purpose. Betty and Laverl removed the tank, painted the barn, and installed plumbing, a shower, and tile. Laverl testified that even though the dairy barn appraised at $40,000.00 when he bought it, "It's my opinion you couldn't [get] nothing for it." Driggers testified that the dairy barn was valued at $15,000.00 after improvements. He also testified that while the dairy barn was improved, it could be viewed as "something somebody would want to take out." Laverl does not dispute the post-improvement values assigned to the cabin and dairy barn.

In that case, the wife sought community reimbursement for the enhancement of husband's separate estate. The improvements included the building of a barn, an office building, and a lighted roping arena. The wife testified that the land with the improvements would be worth a little more than $100,000.00 and that without the improvements, it would be worth between $2,500.00 and $4,000.00 per acre. This testimony provided a range in value of enhancement of $9,020.00 to $43,150.00 and was sufficient to sustain a finding as to the amount of the enhancement in value. *Id.*

Here, the sworn inventory and appraisement, offered into evidence without objection, together with Driggers' report and testimony, was sufficient evidence of the enhanced value of Laverl's separate estate. We overrule this point of error.

### (3)    Reimbursement Award Did Not Include Value of Betty's Time, Toil, and Effort

Laverl next claims, to the extent the trial court based the reimbursement award on Betty's time, toil, and effort, it abused its discretion. Laverl complains that Betty did not plead for reimbursement for her time, toil, and effort in enhancing the value of Laverl's separate property, and disclaimed any interest in being reimbursed for her work in improving the farm. Moreover, Laverl claims Betty failed to prove the value of her time, toil, and effort, and therefore asks this Court to reform the decree to eliminate the reimbursement award, or, alternatively, to remand the cause for a new property division.[15]

---

[15]Betty's petition specifically sought reimbursement for funds or assets expended by both the community and her separate estate for enhancing Laverl's separate estate. The Texas Family Code provides that a claim for reimbursement includes capital improvements to property other than by incurring debt. TEX. FAM. CODE ANN. § 3.402(a)(8) (West Supp. 2012). Betty maintains her reimbursement claim for capital improvements covers funds

A right to reimbursement arises when community time, toil, and effort are utilized to benefit and enhance a spouse's separate estate, beyond that reasonably necessary for management and preservation, for which the community did not receive adequate compensation. *Jensen*, 665 S.W.2d at 110. However, the contributing spouse is not entitled to the enhanced value of the separate property, but only to the value of the uncompensated time and labor. *Id.* at 109. Betty maintains she offered sufficient evidence of the value of the time, toil, and effort expended in enhancing Laverl's separate estate. Because the enhancement award does not include a monetary value for Betty's time, toil, and effort, we need not decide the issue of whether the evidence is sufficient to establish that value.[16]

It is apparent that reimbursement to the community estate for enhancement of Laverl's separate property is based on the evidence of market value of the property before and after improvements. As previously discussed, the evidence established that the fair market value of

and assets—time, toil, and labor, expended in effecting those improvements. Moreover, the Texas Family Code permits a more liberal construction of the pleadings pertaining to property division than in other civil cases. *Smith*, 715 S.W.2d at 157.

Additionally, Betty claims that even if her pleadings fail to state a claim for recovery of the value of her time, toil, and effort in enhancing Laverl's separate property, the issue was tried by consent. Betty offered extensive testimony regarding work expended on effecting the improvements to Laverl's separate estate, without objection. *See id.* at 156 (no objection to absence of reimbursement pleadings or to evidence showing improvements and enhancement to value of separate property by community estate; issue was tried by consent).

[16]There is ample evidence of Betty's extensive work on the property for over three years in building the home, in remodeling the cabin, and improving the dairy barn. She argues the record further includes sufficient evidence of the value of this labor based on Laverl's testimony that the house could not have been built if the couple had not done it themselves. From this premise, Betty argues that any workers hired to perform this labor would have been paid at least minimum wage. Betty then calculates the amount for two workers earning minimum wage based on a forty-hour work week for a period of four and one half years to arrive at the value of her uncompensated time, toil, and labor. Betty further maintains that the *Jensen* rule, measuring reimbursement as the value of time and effort expended to enhance the separate estate, other than that reasonably necessary to manage and preserve the separate estate, for which the community did not receive adequate compensation, should not apply to a reimbursement situation outside of a business entity under the control and direction of a spouse. *See Jensen*, 665 S.W.2d at 110–11 (Robertson, J., concurring).

Laverl's separate property prior to improvements was $325,000.00; the value was $502,960.00 after improvements. The trial court determined Laverl's separate estate was enhanced by the community in the amount of $177,960.00.[17] The enhancement award does not include a monetary value for Betty's time, toil, and effort in enhancing Laverl's separate estate. The trial court's finding that such effort was expended in improving Laverl's separate property is merely an acknowledgement of Betty's hard work for a period of years. We overrule this point of error.

### (4) Reimbursement for One-Half of the Enhanced Value of Separate Estate Was Not An Abuse of Discretion

"The discretion to be exercised in evaluating a claim for reimbursement is equally as broad as the discretion exercised by a trial court in making a just and proper division of the community estate." *Nelson*, 193 S.W.3d at 632 (citing *Lucy v. Lucy*, 162 S.W.3d 770, 776 (Tex. App.—El Paso 2005, no pet.)). When a reimbursement award does not appear to be unjust, there is no abuse of discretion. *Bigelow*, 286 S.W.3d at 623. The trial court appropriately exercised its discretion in awarding Betty one-half of the proven enhanced value of Laverl's separate estate.

### B. Award of One-Half of the Net Value of the Cattle Was Not an Abuse of Discretion

The trial court found that Betty was to be reimbursed for amounts expended from her separate property toward the purchase of cattle in the amount of $24,038.00.[18] The trial court

---

[17]Each party was awarded one-half of the total enhancement value.

[18]This amount represents one-half of the value of the cattle owned by the parties at the time of the final hearing, less the amount of a promissory note owed to Alliance Bank on the cattle of $55,000.00. One hundred and eight cows were valued at $600.00 per head, for a total of $64,800.00. Eighty-three calves were valued at $425.00 per head, for a total of $35,275.00, and three bulls were valued at $1,000.00 per head, for a total of $3,000.00. These figures total $103,075.00. The values placed on the cattle, calves, and bulls are not disputed. When the amount owed on the

17

concluded that Betty "should be awarded reimbursement for her 1/2 interest in the cattle of $24,038.00 for separate funds that she invested in the cattle . . . ."

Laverl had a cattle operation both before and during the marriage.[19] Although the evidence is disputed as to amounts, Betty testified that she and Laverl purchased cattle during the marriage with her money. She testified that she purchased twenty-two head of cattle and one bull for about $29,400.00 with her money. Betty further testified that she later purchased more cattle for almost $25,000.00, using her money, and that she wrote a check to Laverl for $12,500.00, so that he could purchase more cattle in Paris, Texas. According to Betty, these purchases were made with funds from her savings account in Arkansas.[20] The record reflects that the checks for these later transactions were written from the Alliance Bank account.[21]

On appeal, Laverl maintains that whatever funds Betty used to purchase cattle during the marriage were from bank accounts into which she deposited all of her income during the marriage. Betty testified that all of her income was in the Newport Bank in Arkansas until 2006.

---

cattle is subtracted, their net value is $48,075.00. Betty was awarded one-half of this amount, or $24,037.50 (Betty's award was $24,038.00). Laverl was awarded the above-listed cattle as his sole and separate property.

[19]Laverl testified that he owned cattle prior to the marriage, but most of these cattle were sold in 2004. Laverl did not attempt to trace the proceeds of the cattle he sold.

[20]When her first husband passed away, Betty inherited a rice farm in Arkansas. Betty deeded the farm to her children, but retained a life estate. Consequently, she receives $10,000.00 each year for profits earned on the farm. Betty testified that she deposited the money received from rice farm payments in a savings account in Arkansas, where she resided prior to the marriage. Betty further testified that she changed banks around the first part of 2006, and opened a new account.

[21]Betty produced a check dated February 2006 made out to "Cattleman L.S. Com." in the amount of $24,660.00. The memo line on the check indicates it is for "22 cows, 1 bull." The check is drawn on an Alliance Bank account in Betty's name only.

18

Betty had a checking account at Alliance that was solely in her name, and a second checking account at Alliance that was a joint account with Laverl.[22]

Laverl claims the interest earned on Betty's separate money from the inception of the marriage was community property. *See generally McClary v. Thompson*, 65 S.W.3d 829, 834 (Tex. App.—Fort Worth 2002, pet. denied) (benefits from retirement plan earned during marriage are community property); *see also McKinley v. McKinley*, 496 S.W.2d 540, 543 (Tex. 1973) (original $9,500.00 savings certificate was separate property; interest and dividends earned during marriage were community property). He maintains that as a result, the funds Betty used to purchase cattle emanated from bank accounts in which separate and community funds (interest earned during the marriage) were comingled. It is presumed that separate funds in comingled accounts sink to the bottom and that community funds are drawn out first. *See Mock v. Mock*, 216 S.W.3d 370, 373 (Tex. App.—Eastland 2006, pet. denied). Laverl therefore contends that funds withdrawn from Betty's account to purchase cattle were community funds, because the separate funds are presumed to have sunk to the bottom of the account.[23]

Property possessed by either spouse during the marriage is presumed to be community property. TEX. FAM. CODE ANN. § 3.003(a). To overcome this presumption, the separate character of property must be proved by clear and convincing evidence. TEX. FAM. CODE ANN. § 3.003(b). Clear and convincing evidence means the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations

---

[22]The joint account predates 2006.

[23]The "community-out first" presumption generally applies when a party is attempting to overcome the community presumption. *See Smith v. Smith*, 22 S.W.3d 140, 146 (Tex. App.—Houston [14th Dist.] 2000, no pet.).

19

sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2008). A party seeking to rebut the community presumption must trace assets on hand during the marriage back to property that, because of its time and manner of acquisition, is separate in character. *Boyd v. Boyd*, 131 S.W.3d 605, 612 (Tex. App.—Fort Worth 2004, no pet.). "Tracing involves establishing the separate origin of the property through evidence showing the time and means by which the spouse originally obtained possession of the property." *Id.* at 612.

Betty claims she established the separate character of the funds expended to purchase the cattle, citing an exhibit which is a handwritten summary of "Jan's Acct." (Jan is Betty's nickname and the name to which she was often referred at trial) at Alliance Bank. This exhibit demonstrates that the source of the funds for the $24,660.00 check emanated from Betty's A.G. Edwards retirement account, payments received on her separate property, and government payments on her separate land. This summary was admitted without objection, and indicates various deposits as noted during 2005 and 2006. The summary does not indicate what amount of interest, if any, was earned on this checking account. There is no indication of the amount of interest earned on the funds transferred from the A.G. Edwards account.[24] We, therefore, cannot know how much interest there was in this account. Additionally, the documentation does not indicate when the account was opened, or the source of the initial funds used to open the account. It is unclear if other sources of deposit were taken from interest bearing accounts prior

---

[24]Given the date of the parties' marriage in 1998, it is fair to assume the A.G. Edwards account included earnings accrued during the marriage.

20

to placement in the Alliance account. Thus, it is impossible to accurately trace the separate property portion of the funds used in 2006 to purchase cattle in the amount of $24,660.00.

Likewise, it is impossible to accurately trace the separate property portion, if any, of the $12,500.00 check Betty gave to Laverl to purchase cows. Betty testified these funds were from her savings account; Betty also testified, however, that exhibit eight, her handwritten summary, reflected purchases "from [her] account in '05 forward as to more things that [she] bought, along with deposits that [she] made into that account." This summary refers to the same checking account at Alliance Bank previously discussed. For the reasons previously discussed, we are unable to accurately trace the separate property portion of the funds used in 2007 to purchase cattle in the amount of $12,500.00.[25]

There is incomplete documentary evidence, and less-than-compelling oral evidence, of tracing Betty's Alliance account from its presumed status as community property, during the marriage, to Betty's separate property, before the marriage. Betty failed to accurately segregate the separate and community property interests. Here, the trial court was left to speculate, based on Betty's testimony and the sketchy records, what part of the account was the original separate-property principal and what part was community. *See Latham v. Allison*, 560 S.W.2d 481, 485 (Tex. Civ. App.—Fort Worth 1977, writ ref'd n.r.e.) (conjecture concerning source of funds is insufficient to trace); *see also McKinley*, 496 S.W.2d at 544 (community presumption prevails if

_____

[25]We find no documentation concerning Betty's alleged purchase of twenty-two head of cattle and one bull for $29,400.00. Betty's exhibit nine indicates that she purchased twenty-two head of cattle and one bull for $24,660.00. Her earlier testimony that she made this purchase for "$29,400.00 or something like that, I think," appears to perhaps be a different recollection of the amount for which the cattle were purchased.

21

speculation is required to assess character of property). The trial court therefore erred in characterizing these funds as Betty's separate property. This error was, however, harmless.

Even though funds used to purchase cattle should have been characterized as community,[26] we nevertheless review the trial court's division of marital property under an abuse of discretion standard. *Murff v. Murff*, 615 S.W.2d 696, 698–99 (Tex. 1981); *Stavinoha v. Stavinoha*, 126 S.W.3d 604, 607–08 (Tex. App.—Houston [14th Dist.] 2004, no pet.). We may reverse the trial court's division of marital property only if, after reviewing the record, it is clear that the trial court's decision is an abuse of discretion or is manifestly unjust and unfair. *Stavinoha*, 126 S.W.3d at 607–08; *see also Sutton v. Eddy*, 828 S.W.2d 56, 58 (Tex. App.—San Antonio 1991, no writ) (record must affirmatively show that trial court's decision is arbitrary and unreasonable).

Betty received one-half of the net value of the cattle. Laverl was thus not harmed by the characterization of the award as reimbursement to Betty's separate estate, based on expenditures of her separate funds. *See Allen v. Allen*, 704 S.W.2d 600, 603 (Tex. App.—Fort Worth 1986, no writ) (mere mischaracterization of property not reversible unless such mischaracterization results in manifestly unjust and unfair property division); *King v. King*, 661 S.W.2d 252, 254 (Tex. App.—Houston [1st Dist.] 1983, no writ) (error in mischaracterization of separate property

---

[26]Laverl does not contend the cattle were purchased with his separate funds. In fact, Laverl conceded that $11,560.00 of Betty's separate funds were used to buy cattle during the marriage. He further contends the remainder of the purchases came from community funds. Even so, this testimony does not support the conclusion that Betty expended $24,038.00 in separate funds for cattle purchases.

harmless unless such error results in manifestly unjust and unfair property division).[27] Here, the trial court's monetary award of one-half of the net value of the cattle to Betty was not manifestly unjust or unfair. We overrule this point of error.

## C. No Abuse of Discretion in Award of Appellate Attorney's Fees

The trial court conditionally awarded Betty appellate attorney's fees in the amount of $7,500.00, payable in the event Laverl's appeal is unsuccessful. Laverl maintains that such award was unnecessary for the preservation of property during appeal, and is thus an abuse of discretion requiring reversal.

The Texas Family Code provides that within thirty days of the date an appeal is perfected in a suit for dissolution of marriage, the trial court may render a temporary order "necessary for the preservation of the property and for the protection of the parties during the appeal," including an order to require the payment of reasonable attorney's fees and expenses. TEX. FAM. CODE ANN. § 6.709(a)(2) (West 2006).[28] The attorney's fee award is reviewed for an abuse of discretion. *Halleman v. Halleman*, No. 02-11-00184-CV, 2012 WL 3600001, at *10 (Tex. App.—Fort Worth Aug. 23, 2012, no pet. h.); *Love v. Bailey-Love*, 217 S.W.3d 33, 36 (Tex.

---

[27]The trial court found that the property division was just and right, irrespective of the characterization of any item of property as either community or separate. *See Vandiver v. Vandiver*, 4 S.W.3d 300, 302 (Tex. App.—Corpus Christi 1999, pet. denied) (mischaracterization of investment account as separate property did not require reversal, in light of trial court's finding that property division was just and right regardless of any mischaracterization of property).

[28]Section 6.709(b) provides that "[t]he trial court retains jurisdiction to enforce a temporary order under this section unless the appellate court, on proper showing, supersedes the trial court's order." TEX. FAM. CODE ANN. § 6.709(b) (West 2006). This provision suggests that "[t]he appellate court may [supersede the trial court's order] to allow review of the order by the appellate court in the pending appeal." *In re Merriam*, 228 S.W.3d 413, 416 (Tex. App. —Beaumont 2007, no pet.) (per curiam). We, thus, consider the issue of attorney's fees with the merits of the pending appeal from the final judgment. *See id.*

App.—Houston [1st Dist.] 2006, no pet.). The trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). The mere fact that a trial court may decide a matter within its discretionary authority in a different manner than an appellate court in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 242 (Tex. 1985); *In re Estate of Boren*, 268 S.W.3d 841, 846 (Tex. App.—Texarkana 2008, pet. denied).

Betty testified at the hearing on motion for temporary orders pending appeal that in order to obtain appellate counsel, she had to cash out $7,500.00 from her separate property funds. This was done at a time when Laverl had exercised control of the community estate for a period of almost two years. The only item awarded to Betty in the decree which was in her possession was a car.[29] Presumably, Laverl could access the remainder of the property, if necessary, to pay his attorney's fees; Betty, however, could not.[30] Betty, age seventy and retired, explained that she did not want to deplete her separate estate for payment of attorney's fees, especially in light of the fact that she is the sole caretaker for her adult son, who is unable to walk.

---

[29]Betty was also awarded her separate property, owned prior to the marriage. This award consists of her pension payments, her social security income, an account with Raymond James of less than $600.00, a bond fund with Raymond James in the approximate sum of $6,760.00, an annuity fund with Raymond James in the approximate sum of $50,239.50, a contract for deed on Betty's Arkansas property, with monthly note receivable in the sum of $251.18, the monthly payment for Betty's separate property sold in Arkansas, in the amount of $405.00 per month, and a life estate situated in Arkansas. Laverl was awarded his separate property, which includes the house and 130.551 acres of land in Hopkins County, 328.048 acres of land located in Hopkins County, his retirement account with Raymond James with an approximate balance of $40,044.56, and his social security income of $670.00 per month.

[30]Betty testified that Laverl was selling cattle during this time. There is no evidence of the source of the funds utilized by Laverl to hire appellate counsel.

24

Betty's attorney testified that based on his knowledge of similar fees charged in the area, the appellate fee of $7,500.00 is reasonable and necessary.

The trial court did not abuse its discretion by awarding Betty conditional appellate attorney's fees. We overrule this point of error.

## III.     Conclusion

We affirm the judgment of the trial court.

Bailey C. Moseley
Justice

Date Submitted:     September 10, 2012
Date Decided:       October 2, 2012